1  **BURSOR & FISHER, P.A.**
2  Philip L. Fraietta (State Bar No. 354768)
   1330 Avenue of the Americas, 32nd Floor
3  New York, NY 10019
   Telephone: (646)-837-7150
4  Facsimile: (212) 989-9163
   Email: pfraietta@bursor.com
5
6  **BURSOR & FISHER, P.A.**
   Stefan Bogdanovich (State Bar No. 324525)
7  1990 North California Blvd., 9th Floor
   Walnut Creek, CA 94596
8  Telephone: (925) 300-4455
   Facsimile:  (925) 407-2700
9  E-mail: sbogdanovich@bursor.com
10
   *Attorneys for Plaintiff*
11
12              **UNITED STATES DISTRICT COURT**
13       **CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION**
14
   NATALIE GIANNE, individually and on      Case No.   2:25-cv-2425
15 behalf of all others similarly situated,
16                    Plaintiff,            **CLASS ACTION COMPLAINT**
17           v.                             <u>**DEMAND FOR JURY TRIAL**</u>
18 ACCOR MANAGEMENT US INC.,
   f/k/a FAIRMONT HOTELS & RESORTS
19 (U.S.) INC.,
20                    Defendant.
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Natalie Gianne files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Accor Management US Inc., f/k/a Fairmont Hotels & Resorts (U.S.) Inc. ("Defendant" or "Fairmont"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.     This is a class action lawsuit brought on behalf of all California residents who have accessed and used fairmont.com (the "Website"), a website that Defendant owns and operates.

2.     Defendant aids, employs, agrees with, or otherwise enables several third parties – LinkedIn Corp. ("LinkedIn"); Meta Platforms, Inc. ("Meta"); and Snap Inc. ("Snap") (collectively, the "Third Parties") – to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by Cal. Civil Code § 53.5).   By failing to procure consent before enabling the Third Parties' interception of these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3.     Plaintiff Natalie Gianne is a resident and citizen of Los Angeles, California.  In or around 2005, Plaintiff Gianne created a Facebook account.  Several times, including in March 2025, Plaintiff Gianne visited Defendant's Website, fairmont.com, on the same browser that she used to access Facebook.  Plaintiff Gianne was in California when she visited the Website.  Upon accessing the Website, as alleged in greater detail below, Plaintiff Gianne browsed and booked a Fairmont hotel. Each of these communications was intercepted in transit by the Third Parties – as enabled by Defendant – including communications that contained Plaintiff Gianne's confidential "guest records," as defined by Cal. Civil Code § 53.5.  Neither Defendant

nor the Third Parties procured Plaintiff Gianne's prior consent to this interception.

4.      Defendant Accor Management US Inc., f/k/a Fairmont Hotels & Resorts (U.S.) Inc. is a Delaware corporation with its principal place of business at 137 National Plaza, Suite 300, Unit 306, National Harbor, Maryland 20745. Defendant does business across the nation and operates numerous hotels throughout California.[1]

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

6.      The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's communications in this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**I.      The California Invasion of Privacy Act**

8.      The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

---

[1] https://www.fairmont.com/destinations/.

9.      The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

10.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

12.     CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13.    As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

15.    Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendant.

## II.    California Civil Code § 53.5

16.    As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential. Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a).

17.    Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

18.    Further, the legislative history of § 53.5 indicates:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(a) In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

(b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

(c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

(d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

(e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential

physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[2]

19.    Here, Website users' communications with Fairmont – made while browsing and booking Fairmont hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

20.    First, the communications include "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  As described *infra*, §§ IV, VI, Defendant enables LinkedIn to identify individual Website users by their respective LinkedIn member accounts, utilizing several cookies, including the _guid; lms_ads; and lms_analytics cookies.  Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies.  Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., email address, phone number, etc.).  Defendant enables Snap to identify individual Website users by their respective Snapchat

---

[2] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

accounts, utilizing several cookies, including the _scid; _scid_r; sc_at; and sc-a-nonce cookies.  Defendant also enables Snap to identify individual Website users through PII (personally identifiable information) matching, by which Snap records the contact details Website users provide on the Website (i.e., email address, phone number, etc.).  These pieces of data collected by LinkedIn, Meta, and Snap constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals.  *Id.*

21.   Website users' communications with Fairmont also "identif[y] an individual [as a Fairmont] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.*  The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay.  The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.  These communications "identif[y] an individual [as a Fairmont] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Fairmont – individuals with "express or implied invitation to enter or use [Fairmont's] premises."[3]  These communications also identify certain Website users (those who complete the booking process) as Fairmont hotel "guests" and "customers."

22.   Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide

---

[3] INVITEE, Black's Law Dictionary (11th ed. 2019).

services outlined in [a] contract [with Fairmont] that has no independent right to use or share the data beyond the terms of the contract." Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant. *See infra*, § VII. Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

**III.    Overview of Defendant's Website**

23.    Defendant owns and operates the Website. Defendant has integrated the Third Parties' wiretaps into the Website.

24.    On the Website, Website users can, *inter alia*, browse and book Fairmont hotels. When doing so, Website users provide Defendant with confidential information, including "guest records" under Cal. Civil Code § 53.5. *See supra* § II.

25.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using the Third Parties' respective wiretaps.

26.    Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

27.    Website users may browse and book Fairmont hotel rooms. To do so, users type and/or select from a list the destination to which they wish to travel. Next,

users click the dates for their trip, the number of rooms required, the number of adults and children who will be traveling, and/or special rates for which they are eligible. The Third Parties, as enabled by Defendant, contemporaneously intercept Website users' button clicks selecting such items:



**Website "Screen 1"**

28.    Then, Website users pick the type of room (i.e., double, queen, king bed, etc.) in which they wish to stay.



**Website "Screen 2"**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    9

1        29.    Website users subsequently select enhancements for their stay (i.e.,

2    early check-in, late checkout, etc.).



**Website "Screen 3"**

    30.    Finally, Website users check out by typing their personal information

(first and last name, email, phone number) and entering their payment information.



**Website "Screen 4"**

## IV.    Overview of the Third Parties' Tracking Technologies

31.    LinkedIn, Meta, and Snap each wiretap the Website with their respective tracking technologies, which Defendant purposefully installed on the Website.

32.    The Third Parties' tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening. The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity. This entire process occurs within milliseconds. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant. Thus, the Third Parties' interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 710 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

### A.    LinkedIn

33.    LinkedIn wiretaps the Website with trackers associated with the "LinkedIn Insight Tag," which is a "code snippet [that website operators, like Defendant] add[] to [their] website[s] [to] help [] optimize [advertising] campaigns,

retarget [] website visitors, and learn more about [website] audiences."[4]    The "LinkedIn Insight Tag enables the collection of data regarding [individuals'] visits to [a] website, including [] URL, referrer, IP address, device and browser characteristics (User Agent), [] timestamp[,]" and "actions [such as ]button clicks, page visits, and form submissions[.]"[5]

34.    The Insight Tag "relies on LinkedIn cookies, which enable [LinkedIn] to match [] website visitors to their respective LinkedIn member accounts. Once matched, [LinkedIn] can tally [website users'] actions in Campaign Manager so [advertisers] can use the data to analyze [a] website's conversion flows and optimize [] ad campaigns."[6]    Notably, advertisers can "[t]arget [] ideal customer[s] based on traits like their job title, company name, industry, and by professional or personal interests" and "deliver unique content based on actions [a website user] ha[s] taken[.]"[7] Website operators can also "add enhanced matching … [to] send additional information with [] Insight Tag data, such as an email address provided when a customer submits a form on [a] website."[8]    This helps "match [even] more [ ] website visitors to LinkedIn accounts."[9]

[4] LinkedIn, Insight Tag, https://business.linkedin.com/marketing-solutions/insight-tag.

[5] LinkedIn, Understanding Website Actions, https://www.linkedin.com/help/lms/answer/a1377941.

[6] LinkedIn, Insight Tag, https://business.linkedin.com/marketing-solutions/insight-tag.

[7] LinkedIn, Ad Targeting, https://business.linkedin.com/marketing-solutions/cx/21/10/ad-targeting. *See also* LinkedIn, Matched Audiences, https://business.linkedin.com/marketing-solutions/ad-targeting/matched-audiences; LinkedIn, Conversion Tracking, https://business.linkedin.com/marketing-solutions/conversion-tracking.

[8] LinkedIn, Enhanced Matching for your Website, https://www.linkedin.com/help/lms/answer/a6241147.

[9] *Id.*

**B.    Meta**

35.    Meta wiretaps the Website with trackers associated with the "Meta Pixel."[10]   According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[11]   Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[12]   Advertisers can also create their own tracking parameters by building a "custom event."[13]   Thus, the Meta Pixel helps "understand[] the actions people take on [a] website."[14]

36.    The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[15]   Additionally, "[w]ith advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."[16]

37.    This is highly useful for marketing and advertising.  Specifically, the Meta Pixel can be used to help "measure ad effectiveness"; "define custom audiences for ad targeting"; and support "Advantage+ catalog ads campaigns[.]"[17]

---

[10] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[11] *Id.*

[12] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655.  *See also* META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[13] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[14] *Id.*

[15] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[16] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[17] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

---

38.    With respect to measuring ad effectiveness, "[t]rack[ing ] website visitors' actions[,] also known as conversion tracking[,] ... can be used to … calculate [] return[s] on ad investment[s]."[18]  "In [the] Meta Ads Manager, [website operators] can see how many conversions happened as a result of [their] Meta ads."[19]  This includes "cross-device reporting, which lets [advertisers] see cross-device conversions across apps and the web (for example, if a customer sees an ad for a product on their mobile phone, but decides to buy it later on their desktop computer)."[20]

39.    A "custom audience is an ad targeting option"[21] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[22]  Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[23]  Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers[]" (i.e., "Lookalike Audience[s]").[24]

---

[18] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[19] META, USE CONVERSION TRACKING TO MEASURE RESULTS, https://www.facebook.com/business/help/339239069606476.

[20] *Id.*

[21] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[22] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[23] *Id.*

[24] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    14

40.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[25] Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[26]

### C.    Snap

41.    Snap wiretaps the Website with trackers associated with the "Snap Pixel,"[27] which is a "piece of JavaScript code" that website operators, like Defendant, "place … within [their] website[s to] track[] the actions Snapchatters [and other users] take while browsing [the] site."[28]  Specifically, the Snap Pixel "[m]easures [] conversion events"[29] – including a menu of "standard events" like "PURCHASE" ("[t]rack purchases"); "SAVE" ("[t]rack add to wishlist events of specific items"); "START_CHECKOUT" ("[t]rack checkout events"); "ADD_CART" ("[t]rack add to cart events of specific items"); "VIEW_CONTENT" ("[t]rack content view events"); "SEARCH" ("[t]rack search events"); "PAGE_VIEW" ("[t]rack webview pages"); and "RESERVE" ("[t]rack reservations").[30]  The Snap Pixel can also "[t]rack … custom events" with "custom J[ava]S[cript] function[s]" set by website operators.[31]

42.    When this data is transmitted to Snap, it is coupled with, *inter alia*, "[b]rowser level info[] … such as IP address, web page domain, user agent,

---

[25] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[26] *Id.*

[27] SNAP, USING THE SNAP PIXEL, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it.

[28] *Id.*

[29] *Id.*

[30] SNAP, DIRECTLY IMPLEMENT THE PIXEL ON YOUR WEBSITE, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation.

[31] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    15

document, referral, first and third-party cookies"; "[m]etadata … such as HTML tags"; and "a Pixel ID[.]"[32]  In addition, the Snap Pixel can collect "user parameter[s] (email or phone number)" and "[f]irst [n]ame"; "[l]ast [n]ame"; "[c]ity"; "[s]tate"; "[z]ip [c]ode"; "[c]ountry"; and "[a]ge[.]"[33]  The Snap Pixel's "Automated Matching" feature offers a way to streamline this "PII matching[,]"[34] by "automatically attempt[ing] to detect and send Snap information about [] customers such as information from forms on [a] website[,]" and then using "[t]hese high quality signals … to improve features associated with the Pixel such as targeting, measurement, and optimization."[35]

43.    Thus, through the Snap Pixel, Snap can "match a customer e-mail or phone number back to a Snapchatter e-mail or phone number[]" and "attribute website actions to Snapchatters."[36]  Indeed, Snap measures "how well [a website operator's P]ixel setup matches events to Snapchat Accounts[,]" with a metric called "Event Quality Score (EQS)."[37]  This, in combination with the Snap Pixel's other features, helps "optimize ad delivery"; create Custom Audiences that "target users who have visited [a] site, completed specific actions, or engaged with [] ads"[38]; and "create a type of Custom Audience called a Lookalike Audience, which seeks out people who … are similar to [a website's] best customers."[39]

---

[32] SNAP, PIXEL IMPLEMENTATION FAQS,
https://businesshelp.snapchat.com/s/article/snap-pixel-faq.
[33] SNAP, DIRECTLY IMPLEMENT THE PIXEL ON YOUR WEBSITE,
https://businesshelp.snapchat.com/s/article/pixel-direct-implementation.
[34] SNAP, PIXEL IMPLEMENTATION FAQS,
https://businesshelp.snapchat.com/s/article/snap-pixel-faq.
[35] SNAP, PIXEL FAQS, https://businesshelp.snapchat.com/s/article/pixel-faqs.
[36] SNAP, PIXEL IMPLEMENTATION FAQS,
https://businesshelp.snapchat.com/s/article/snap-pixel-faq.
[37] SNAP, SNAP PIXEL: POWER YOUR AD PERFORMANCE,
https://forbusiness.snapchat.com/advertising/snap-pixel.
[38] Id.
[39] SNAP, USING THE SNAP PIXEL, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it.

---

1  **V.    Defendant Aids, Agrees with, Employs, or Otherwise Enables the Third**
2  **Parties to Wiretap Californians' Communications**

3  **A.    LinkedIn**

4      44.    LinkedIn, as enabled by Defendant, contemporaneously intercepts the

5  following Website communications.

▼ {pids: [81684], scriptVersion: 183, time: 1737129121544, domain: "fairmont.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "LABEL",…}
    backgroundImageSrc: null
    cursor: "pointer"
    elementSemanticType: null
    elementTitle: null
    elementType: null
    elementValue: null
    formAction: "/"
    imageAlt: null
    imageSrc: null
    innerText: "Senior Discount"
    isFormSubmission: false

v: 2
fmt: js
pid: 81684
time: 1738685303564
li_adsId: 6b744852-1545-489d-a5fd-3b926ce52e53
url: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&bt=1&rt=PRSEN1

45.    As shown by the red highlight in the above excerpts of the Website's transmissions, LinkedIn intercepts the destination selected by users (here, "SAN DIEGO, California, USA;" "Fairmont Grand Del Mar").  As shown by the yellow highlights, LinkedIn intercepts the desired trip dates selected by users (here, "2/18/2025"; "2/19/2025"; "ad=18/02/2025&dd=19/02/2025"). As shown by the green highlights, LinkedIn intercepts the numbers of rooms and guests selected by users (here, "1Room - 2 Guests") and when users increase the number of adults in a room (here, "Increase Adult  - Room 1").  As shown by the brown highlight, LinkedIn intercepts the bed preference selected by users (here, "King or Queen"). As shown by the blue highlights, LinkedIn intercepts the special rates selected by users (here, "Senior Discount").  These communications are the product of button clicks on Website Screen 1.

    elementType: "button"
    elementValue: null
    formAction: "/reservations/select-room/"
    imageAlt: null
    imageSrc: null
    innerText: "SELECT THIS ROOM"
    isFormSubmission: false
    onClick: "SetGoogleEventTrackingForClickEventNewWithPageName('bloc_interact','{\"pagename\":\"reservations::step2::select a
    tagName: "BUTTON"
SetGoogleEventTrackingForClickEventNewWithPageName('bloc_interact','{"pagename":"reservations::step2::select a
room","bloc_name":"room bloc","bloc_interaction":"select room - fairmont
")');SetGoogleEventTrackingForClickEventNewWithPageName('bloc_interact','{"pagename":"reservations::step2::select a
room","bloc_name":"room bloc","bloc_interaction":"bed type - one king bed"');
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▶ misc: {psbState: -4}
    pageTitle: "Select a Room - Fairmont Grand Del Mar - Fairmont Hotels and Resorts"
  ▶ pids: [81684]
    scriptVersion: 199
    signalType: "CLICK"
    time: 1738687008671
    url: "https://fairmont.com/reservations/select-room/"

▼ {pids: [81684], scriptVersion: 199, time: 1738687359964, domain: "fairmont.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: "CHOOSE THIS RATE", elementType: "submit", tagName: "INPUT",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "submit"
      elementValue: CHOOSE THIS RATE
      formAction: "/reservations/select-room/"

46.     As shown by the brown highlight in the above excerpt of the Website's
transmissions, LinkedIn intercepts the type of room a Website user selects (here,
"one king bed").  As shown by the blue highlight, LinkedIn intercepts when a user
selects this rate (here, "CHOOSE THIS RATE").  These communications are the
product of button clicks on Website Screen 2.

▼ {pids: [81684], scriptVersion: 183, time: 1737131020953, domain: "fairmont.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "button"
      elementValue: null
      formAction: "/reservations/enhance/"
      imageAlt: null
      imageSrc: null
      innerText: "Fairmont Resort View King With Expansive Marble Bathroom"
      isFormSubmission: false
      tagName: "BUTTON"
    domain: "fairmont.com"
  ▶ elementCrumbsTree: [{tagName: "form", nthChild: 8, id: "aspnetForm",…},…]
    hem: null
    href: ""
    innerElements: null
    isFilteredByClient: false
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▶ misc: {psbState: -4}
    pageTitle: "Enhance Your Stay - Fairmont Grand Del Mar - Fairmont Hotels and Resorts"
  ▶ pids: [81684]
    scriptVersion: 183
    signalType: "CLICK"
    time: 1737131020953
    url: "https://fairmont.com/reservations/enhance/"

▼ {pids: [81684], scriptVersion: 183, time: 1737131172876, domain: "fairmont.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "button"
      elementValue: null
      formAction: "/reservations/enhance/"
      imageAlt: null
      imageSrc: null
      innerText: "EARLY CHECK-IN AT 12:00 PM"
      isFormSubmission: false
      tagName: "BUTTON"
    domain: "fairmont.com"
  ▶ elementCrumbsTree: [{tagName: "form", nthChild: 15, id: "aspnetForm",…},…]
    hem: null
    href: ""
    innerElements: null
    isFilteredByClient: false
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▶ misc: {psbState: -4}
    pageTitle: "Enhance Your Stay - Fairmont Grand Del Mar - Fairmont Hotels and Resorts"
  ▶ pids: [81684]
    scriptVersion: 183
    signalType: "CLICK"
    time: 1737131172876
    url: "https://fairmont.com/reservations/enhance/"

47.    As shown by the brown highlight in the above excerpt of the Website's transmissions, LinkedIn intercepts if a user clicks on a full description of the previously selected room (here, "Fairmont Resort View King With Expansive Marble Bathroom").  As shown by the grey highlight in the above excerpts, LinkedIn intercepts when a Website user selects enhancements for their stay (here, "EARLY CHECK-IN AT 12:00 PM").  These communications are the product of button clicks on Website Screen 3.

{pids: [81684], scriptVersion: 199, time: 1738686845416, domain: "fairmont.com",…}
 ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "A",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      formAction: "/reservations/select-room/"
      imageAlt: null
      imageSrc: null
      innerText: "Price ascending"

{pids: [81684], scriptVersion: 199, time: 1738686734347, domain: "fairmont.com",…}
 ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: "https://www.fairmont.com/frhi/inc/img/heavy-dropdown-arrow-desktop.png"
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "button"
      elementValue: null
      formAction: "/reservations/select-room/"
      imageAlt: null
      imageSrc: null
      innerText: "US DOLLAR\n"

{pids: [81684], scriptVersion: 199, time: 1738686793767, domain: "fairmont.com",…}
 ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: "Room Details"
      elementType: "button"
      elementValue: null
      formAction: "/reservations/select-room/"
      imageAlt: null
      imageSrc: null
      innerText: "Room Details"

48.    As shown by the orange highlights in the above excerpts of the Website's transmissions, LinkedIn intercepts miscellaneous other selections by users such as sorting rooms by price, choosing a currency, or viewing room details (here, "Price ascending"; "US DOLLAR"; "Room Details").  These communications are the product of button clicks on Website Screen 2.

**B.    Meta**

49.    Meta, as enabled by Defendant, contemporaneously intercepts the following Website communications.

```
ev: InitiateCheckout
id: 649915528506999
eid: 1738690385576_17386904195218
fbp: fb.1.1738690081823.1730213718
cd[content_type]: hotel
cd[content_name]: fairmont san diego
cd[content_ids]: "GDM,A574"
cd[content_type]: hotel
cd[content_ids]: GDM,A574
cd[content_name]: fairmont san diego
cd[city]: san diego
cd[country]: united states
cd[checkin_date]: 02/18/2025
cd[checkout_date]: 02/19/2025
cd[num_adults]: 2
cd[num_children]: 0
cd[num_items]: 1
cd[hotel_brand]: fai
```

```
id: 217609515100275
ev: Search
dl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&n=1&na=2&nc=0&ada=0&rt=PRSEN1
rl: https://www.fairmont.com/
if: false
ts: 1738690180217
cd[content_type]: hotel
cd[checkin_date]: 2025-02-18
cd[checkout_date]: 2025-02-19
cd[content_ids]: ["GDM,A574"]
```

50.    As shown by the red highlight in the above excerpts of the Website's transmissions, Meta intercepts the destination selected by users (here, "fairmont san diego"; "united states").  As shown by the yellow highlights, Meta intercepts the desired trip dates selected by users (here, "02/18/2025"; "02/19/2025"; "ad=18/02/2025&dd=19/02/2025").  As shown by the green highlights, Meta intercepts the numbers of rooms, guests, adults, and children selected by users (here, "items]: 1"; "adults]: 2"; "children]: 0"; "n=1&na=2&nc=0").  As shown by the blue highlight, Meta intercepts the special rate selected by users (here, "rt=PRSEN1"). These communications are the product of button clicks on Website Screen 1.

id: 217609515100275
ev: SubscribedButtonClick
dl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1
rl: https://www.fairmont.com/
if: false
ts: 1738692219997
cd[buttonFeatures]: {"classList":"primary-button","destination":"https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1","id":"ctl00_ctl00_CphContent_MainReservationContent rptRoomClass ctl00 rptRooms_ctl00_btnSelectThisRoom","imageUrl":"","innerText":"SELECT THIS ROOM","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}
cd[buttonText]: SELECT THIS ROOM

id: 217609515100275
ev: SubscribedButtonClick
dl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1
rl: https://www.fairmont.com/
if: false
ts: 1738692373004
cd[buttonFeatures]: {"classList":" heavy-ui-body-2 btn-select-rate","destination":"https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1","id":"ctl00_ctl00_CphContent_MainReservationContent_rptRoomClass_ctl00_rptRooms_ctl00_rptRates_ctl00_btn_ChooseRate","imageUrl":"","innerText":"","numChildButtons":0,"tag":"input","type":"submit","name":"ctl00$ctl00$CphContent$MainReservationContent$rptRoomClass$ctl00$rptRooms$ctl00$rptRates$ctl00$btn_ChooseRate","value":"CHOOSE THIS RATE"}
cd[buttonText]: CHOOSE THIS RATE

51.     As shown by the brown highlights in the above excerpt of the Website's transmissions, Meta intercepts the code associated with the type of room selected by users (here, "rptRoomClass_ctl00"; "SELECT THIS ROOM").  As shown by the blue highlight, LinkedIn intercepts when a user selects this rate (here, "CHOOSE THIS RATE").  These communications are the product of button clicks on Website Screen 2.

id: 217609515100275
ev: SubscribedButtonClick
dl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1
rl: https://www.fairmont.com/
if: false
ts: 1738692887010
cd[buttonFeatures]: {"classList":"btn dropdown-toggle btn-default","destination":"https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1","id":"","imageUrl":"url(\"https://www.fairmont.com/frhi/inc/img/heavy-dropdown-arrow-desktop.png\")","innerText":"PRICE ASCENDING\n ","numChildButtons":1,"tag":"button","type":"button","name":"","value":""}
cd[buttonText]: PRICE ASCENDING

id: 217609515100275
ev: SubscribedButtonClick
dl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1
rl: https://www.fairmont.com/
if: false
ts: 1738692966928
cd[buttonFeatures]: {"classList":"btn dropdown-toggle btn-default","destination":"https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1","id":"","imageUrl":"url(\"https://www.fairmont.com/frhi/inc/img/heavy-dropdown-arrow-desktop.png\")","innerText":"US DOLLAR\n ","numChildButtons":1,"tag":"button","type":"button","name":"","value":""}
cd[buttonText]: US DOLLAR

id: 217609515100275
ev: SubscribedButtonClick
dl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1
rl: https://www.fairmont.com/
if: false
ts: 1738692994370
cd[buttonFeatures]: {"classList":"step2-opengallery btnPopupToPopin GTMTrackingFunction lazy loaded","destination":"https://www.f
airmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&rt=PRSEN1","id":"ct100_ct100_CphC
ontent_MainReservationContent_rptRoomClass_ct100_rptRooms_ct100_im OpenGallery ","imageUrl":"/assets/0/104/2829/2834/4392/4398/9
b6ff336-5e3a-4921-b4e9-3d604d11566e.jpg","innerText":"","numChildButtons":0,"tag":"img","type":null}

52.     As shown by the orange highlights in the above excerpt of the Website's transmissions, Meta intercepts miscellaneous other selections by users such as sorting rooms by price, choosing a currency, or opening a photo gallery (here, "PRICE ASCENDING"; "US DOLLAR"; "opengallery"). These communications are the product of button clicks on Website Screen 2.

**C.     Snap**

53.     Snap, as enabled by Defendant, contemporaneously intercepts the following Website communications.

url: "https://www.fairmont.com/"
v: "3.35.2-2501161935"
▾ req: [{md: {btx: "Select the number of rooms and guests :↵1 Room - 2 Guests",…}, del: 41}]
  ▾ 0: {md: {btx: "Select the number of rooms and guests :↵1 Room - 2 Guests",…}, del: 41}
    del: 41
    ▾ md: {btx: "Select the number of rooms and guests :↵1 Room - 2 Guests"
      btx: "Select the number of rooms and guests :\n1 Room - 2 Guests"
      ▸ pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]
  u_scsid: "1b353f0c-690e-4656-ae40-714575d5b837"

pid: 9897feec-1edc-49fe-9d75-207b304bfc45
ev: SEARCH
intg: gtm
pids: 9897feec-1edc-49fe-9d75-207b304bfc45
e_ni: 1
e_iids: GDM A574
e_ic: united states
u_c1: baf1df94-1ea4-47cd-856a-e1a8f620366a
cdid: @-f9d46b6b-dc07-498e-a96d-872d4b59590f
u_sclid: b6f24be9-d7a9-43e6-973c-806f11098c3c
u_scsid: 1b353f0c-690e-4656-ae40-714575d5b837
bg: false
bt: 1d53c387
d_a: x86
d_bvs: [{"brand":"Not A(Brand","version":"8.0.0.0"},{"brand":"Chromium","version":"132.0.6834.160"},{"brand":"Microsoft Edge","v
ersion":"132.0.2957.140"}]
d_os: 15.0.0
d_ot: Windows
huah: true
m_dcl: 0
m_fcps: 2914
m_pi: 0
m_pl: 0
m_pv: 2
m_rd: 29363
m_sh: 720
m_sl: 3924
m_sw: 1280
pl: https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&bt=0&rt=PRSEN1

54.     As shown by the red highlight in the above excerpts of the Website's transmissions, Snap intercepts the destination selected by users (here, "GDM" as in Grand Del Mar).  As shown by the yellow highlights, Snap intercepts the desired trip dates selected by users (here, "ad=18/02/2025&dd=19/02/2025").  As shown by the green highlight, Snap intercepts the numbers of rooms and guests selected by users (here, "1 Room - 2 Guests").  These communications are the product of button clicks on Website Screen 1.



55.     As shown by the blue highlight in the above excerpt of the Website's transmissions, Snap intercepts when a user selects a particular rate (here, "CHOOSE THIS RATE").  This communication is the product of a button click on Website Screen 2.





56.     As shown by the brown highlight in the above excerpts of the Website's transmissions, Snap intercepts if a user clicks on a full description of the previously selected room (here, "Fairmont Resort View King With Expansive Marble Bathroom").  As shown by the grey highlight in the above excerpts, Snap intercepts when a Website user selects enhancements for their stay (here, "EARLY CHECK-IN

AT 12:00 PM").  These communications are the product of button clicks on Website Screen 3.

url: "https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&bt=0&rt=PRSEN1
v: "3.35.2-2501161935"
▼ req: [{md: {btx: "Price ascending", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}, del: 20}]
  ▼ 0: {md: {btx: "Price ascending", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}, del: 20}
    del: 20
    ▼ md: {btx: "Price ascending", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}
      btx: "Price ascending"
    ▶ pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]
  u_scsid: "1b353f0c-690e-4656-ae40-714575d5b837"

url: "https://www.fairmont.com/reservations/select-room/?hc=GDM&ad=18/02/2025&dd=19/02/2025&nn=1&na=2&nc=0&ada=0&bt=0&rt=PRSEN1
v: "3.35.2-2501161935"
▼ req: [{md: {btx: "US DOLLAR⏎ ", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}, del: 13}]
  ▼ 0: {md: {btx: "US DOLLAR⏎ ", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}, del: 13}
    del: 13
    ▼ md: {btx: "US DOLLAR⏎ ", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}
      btx: "US DOLLAR⏎ "
    ▶ pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]
  u_scsid: "1b353f0c-690e-4656-ae40-714575d5b837"

57.     As shown by the orange highlights in the above excerpts of the Website's transmissions, Snap intercepts miscellaneous other selections by users such as sorting rooms by price or choosing a currency (here, "Price ascending"; "US DOLLAR").  These communications are the product of miscellaneous button clicks on Website Screen 2.

## VI.  Defendant Enables the Third Parties to Pair the Above Data with Users' Identities

58.     As discussed *supra*, § IV, the LinkedIn, Meta, and Snap tracking technologies at issue can pair wiretapped data with website users' identities.

59.     The tracking technologies achieve this, at least in part, through cookies. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[40]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[41]

---

[40] PC MAGAZINE, COOKIE TABLE,
https://www.pcmag.com/encyclopedia/term/cookie.

[41] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?,
https://www.cookiebot.com/en/tracking-cookies/.

**A.    LinkedIn**

60.    Through LinkedIn cookies, LinkedIn can identify individual website users by their respective LinkedIn member accounts.

61.    The following image confirms that, when a user accesses the Website while logged into LinkedIn, the LinkedIn tracking technologies on the Website compel that user's browser to transmit several cookies, including the _guid; lms_ads; and lms_analytics cookies.

| Name | Value | Domain |
|---|---|---|
| _dy_toffset | ■ | .fairmont.com |
| AnalyticsSyncHistory | ████████████ | .linkedin.com |
| lidc | ██████████████ | .linkedin.com |
| UserMatchHistory | ██████████ | .linkedin.com |
| AMCV_14215E3D5995C... | ███████ | .linkedin.com |
| fptctx2 | ██████████ | .linkedin.com |
| __cf_bm | ██████████ | .linkedin.com |
| dfpfpt | ██████████ | .linkedin.com |
| lms_analytics | ████████████ | .linkedin.com |
| li_sugr | ████████████ | .linkedin.com |
| liap | ████ | .linkedin.com |
| _gcl_au | █████████ | .linkedin.com |
| bcookie | ██████████ | .linkedin.com |
| lms_ads | ████████████ | .linkedin.com |
| AMCVS_14215E3D5995... | ■ | .linkedin.com |
| _guid | ██████████ | .linkedin.com |
| aam_uuid | ██████████ | .linkedin.com |
| lang | ███████ | .linkedin.com |

62.    The _guid cookie is "[u]sed to identify a LinkedIn Member for advertising through Google Ads" and has a lifespan of ninety days.[42]

63.    The lms_ads cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising" and has a lifespan of thirty days.[43]

---

[42] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[43] *Id.*

64.    The lms_analytics cookie is "[u]sed to identify LinkedIn Members off LinkedIn for analytics" and has a lifespan of thirty days.[44]

**B.    Meta**

65.    Through Facebook cookies, Meta can identify individual website users by their respective Facebook accounts.  Through advanced matching, Meta can also identify individual website users by the personal information they provide on websites (i.e., name, email address, phone number, etc.).

66.    The following image confirms that, when a user accesses the Website while logged into Facebook, the Meta tracking technologies on the Website compel that user's browser to transmit several cookies, including the c_user; datr; fr; and _fbp[45] cookies:

| Name | Value | Domain |
| --- | --- | --- |
| _fbp | ███████ | .fairmont.com |
| fr | ███████████ | .facebook.com |
| xs | ███████████ | .facebook.com |
| c_user | ██████ | .facebook.com |
| dpr | █████████ | .facebook.com |
| presence | █████████████ | .facebook.com |
| wd | █████ | .facebook.com |
| sb | ████████████ | .facebook.com |
| datr | ███████████ | .facebook.com |

67.    The c_user cookie contains, at least, the user's unencrypted Facebook

---

[44] *Id.*

[45] Note, the Meta Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.  Pictured here and in the *infra* two images is the _fbp cookie, sent as a first-party cookie.

---

ID.[46]  The c_user cookie has a lifespan of three hundred sixty-five days.[47]

68.    The datr cookie contains, at least, a value that uniquely identifies a browser.[48]  The datr cookie has a lifespan of four hundred days.[49]

69.    The fr cookie contains, at least, a value that uniquely identifies a browser and the user's encrypted Facebook ID.[50]  The fr has a lifespan of ninety days.[51]

70.    The _fbp cookie contains, at least, a value that uniquely identifies a browser.[52]  The _fbp has a lifespan of ninety days.[53]

71.    When a Website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies:

//

//

---

[46] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[47] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[48] *Id.* ("'Datr' is a unique identifier for your browser[.]").

[49] *Id.*

[50] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[51] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[52] *Id.* ("Cookie[:] _fbp[.] Description[:] These cookies identify browsers for businesses using our Meta Products for the purposes of providing advertising and site analytics services."). *See also* FACEBOOK, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters#fbp ("The Facebook browser ID value is stored in the _fbp browser cookie[.]").

[53] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

---

| Name | Value | Domain |
|------|-------|--------|
| _fbp | ███████████████ | .fairmont.com |
| fr | ███████████████████████ | .facebook.com |
| wd | ████████ | .facebook.com |
| sb | ███████████████████████ | .facebook.com |
| dpr | █████████████ | .facebook.com |
| datr | █████████████████████ | .facebook.com |

72.     No matter the circumstances, Facebook compels the visitor's browser to transmit the _fbp cookie:

| Name | Value | Domain |
|------|-------|--------|
| _fbp | ████████████████ | .fairmont.com |

73.     Defendant also uses "Advanced Matching."  With Advanced Matching, Defendant's Meta Pixels "look for recognizable form field and other sources on [the] website that contain information such as first name, last name and email."[54]  That information is recorded, "along with the event, or action, that took place."[55]

74.     Specifically, as part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[56]

75.     The highlighted line below shows that Defendant enabled Automatic Matching.

```
146        fbq.loadPlugin("automaticmatchingforpartnerintegrations");
147        instance.optIn("217609515100275", "AutomaticMatchingForPartnerIntegrations", true);
148        config.set(null, "batching", {
  -            "batchWaitTimeMs": 10,
  -            "maxBatchSize": 10
```

76.     Thus, Meta, as enabled by Defendant, contemporaneously intercepts users' names, email address, phone numbers, and/or other personal details using the

---

[54] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[55] *Id.*

[56] *See* META, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching; META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    29

Meta Pixel on various pages of the Website.  Although these personal details are "hashed,"[57] the reality is that, even in hashed form, they are traceable to individuals.[58]

77.    Defendant discloses this information to Meta so that Meta can better match Website visitors to their Facebook profiles, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[59]

## C.    Snap

78.    Through Snap cookies, Snap can identify individual website users by their respective Snapchat accounts.  Through user parameters, Meta can also identify individual website users by the personal information they provide on websites (i.e., email address, phone number, etc.).

79.    The following image confirms that, when a user accesses the Website while logged into Snapchat, the Snap tracking technologies on the Website compel

---

[57] *Id.*

[58] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[59] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

---

that user's browser to transmit several cookies, including the _scid; _scid_r; sc_at;
and sc-a-nonce cookies:

| Name ▲ | Value | Domain |
|---|---|---|
| _scid | ███████████████ | .fairmont.com |
| _scid_r | ███████████████ | .fairmont.com |
| blizzard_client_id | ███████████████ | .snapchat.com |
| blizzard_web_session_id | ██████████ | .snapchat.com |
| sc-a-nonce | ███████████████ | .snapchat.com |
| sc_at | ███████████████ | .snapchat.com |

80.    The _scid cookie is "[u]sed to help identify a visitor."[60] The _scid cookie
has a lifespan of one year.[61]

81.    The _scid_r cookie "[s]ets a unique ID for the visitor, that allows third
party advertisers to target the visitor with relevant advertisement."[62]    The _scid_r
cookie has a lifespan of thirteen months.[63]

82.    The sc_at cookie is "[u]sed to identify a visitor across multiple
domains."[64] The sc_at cookie has a lifespan of one year.[65]

83.    The sc-a-nonce cookie is "[u]sed to encrypt session data."[66]  The sc-a-
nonce cookie has a lifespan of a session or one year.[67]

84.    Even when a when a user accesses the Website while not logged in to a
Snapchat account, the Snap tracking technologies on the Website compel that user's
browser to transmit several Snap cookies, including the _scid; _scid_r; and sc_at
cookies:

---

[60] SNAP, COOKIE INFORMATION, https://www.snap.com/privacy/cookie-information.

[61] *Id.*

[62] OPEN COOKIE DATABASE, https://jkwakman.github.io/Open-Cookie-
Database/open-cookie-database.html.

[63] *Id.*

[64] SNAP, COOKIE INFORMATION, https://www.snap.com/privacy/cookie-information.

[65] *Id.*

[66] *Id.*

[67] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    31

| Name | Value | Domain |
|------|-------|--------|
| _scid_r | ██████████████ | .fairmont.com |
| _scid | ██████████████ | .fairmont.com |
| sc_at | ██████████████ | .snapchat.com |

85.    Defendant has also configured the Snap Pixel to collect "user parameter[s]"[68] for "PII matching"[69] – specifically, the hashed email address and hashed phone number user parameters.  This is shown in the below excerpt of a Website transmission, in which Snap intercepted "u_hems" (hashed email address) and "u_hpns" (hashed phone number).



```
    url: "https://www.fairmont.com/reservations/complete-details/"
    v: "3.35.2-2501161935"
▼ req: [{pc: {av: 5, pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"],…}, del: 61},…]
  ▼ 0: {pc: {av: 5, pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"],…}, del: 61}
      del: 61
    ▼ pc: {av: 5, pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"],…}
        av: 5
      ▶ pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]
        u_hems: "6c75c3513c58263a28fe2430ccac94c72f03bf78bb7b66b8e4b4de1caa930f6d"
        u_hpns: "cf14fe3c9d73fcb3574d2643988efbd2b605b1c224725bd322d7d2350467b4dc"
  ▶ 1: {md: {btx: " CHECK EMAIL ADDRESS", pids: ["9897feec-1edc-49fe-9d75-207b304bfc45"]}, del: 61}
    u_scsid: "f08a2333-1fa4-428d-a5a9-ccae3f5a8a33"
```

## VII.   The Third Parties Use Californians' Data for their Own Purposes

86.    When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, the Third Parties – separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.  The Third Parties, themselves, collect the contents of said conversations.  That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

---

[68] SNAP, DIRECTLY IMPLEMENT THE PIXEL ON YOUR WEBSITE, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation.

[69] SNAP, PIXEL IMPLEMENTATION FAQS, https://businesshelp.snapchat.com/s/article/snap-pixel-faq.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    32

87.    The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

88.    In its "LinkedIn Ads Agreement," LinkedIn states: "As part of the Analytics services, to improve ad relevance and reach, LinkedIn may use your Audience Data, whether during or after the term of this Ads Agreement, to analyze and optimize LinkedIn algorithms and to find LinkedIn members probabilistically across devices[.]"[70] LinkedIn further states, in its "LinkedIn Data Processing Agreement," that it will "[p]rocess Customer Personal Data … for the purpose of providing, supporting and improving LinkedIn's services (including to provide insights and other reporting)[.]"[71]  In fact, it seems that, even "on termination of [] data processing services" by a LinkedIn client, LinkedIn "may continue to Process Customer Personal Data that has been aggregated in a manner that does not identify individuals or customers to improve LinkedIn's systems and services."[72]   Thus, LinkedIn has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, analyzing and optimizing LinkedIn's algorithms; finding LinkedIn members; and providing, supporting, and improving LinkedIn's systems and services.

89.    In its "Meta Business Tools Terms,"[73] Meta confirms that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the

---

[70] LINKEDIN, LINKEDIN ADS AGREEMENT, https://www.linkedin.com/legal/sas-terms.

[71] LINKEDIN, LINKEDIN DATA PROCESSING AGREEMENT, https://www.linkedin.com/legal/l/dpa.

[72] *Id.*

[73] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

---

Meta Products."[74]  Further, Meta can "disclose [] Campaign Reports or Analytics … to [] third part[ies,] … [if] they have been combined with Campaign Reports and Analytics from numerous other third parties and [the advertiser using the Meta Business Tools has had its] identifying information [] removed from the combined Campaign Reports and Analytics."[75]  And Meta can use the information it collects to "improve the effectiveness of ad delivery, [] determine the relevance of ads to people[,] … [and] personalize the features and content (including ads and recommendations) that [Meta] show[s] people on and off [] Meta Products."[76]  Thus, Meta has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, its own research and development; ad delivery; feature and content personalization; and product improvement, provision, and securement.

90.    In the "Snap Advertiser Privacy and Security FAQs," Snap states to clients who "provide Snap with data about their customers" that its "Conversion terms [] cover Snap's Pixel and Conversions API[.]"[77]  There, in the "Snap Conversion Terms," it is explained that "Snap and its affiliates may use Event Data" – i.e., "receive[d] data, including about actions taken on websites, apps, or in stores … through Snap tools like pixels, JavaScript SDKs, APIs, or cookies" – "to  provide [Snap] Services[.]"[78]  Snap then expounds upon how it may use Event Data "to provide insights" and "to improve and supplement [Snap] Services (including to optimize Snap's targeting and ad effectiveness)[.]"[79]  Further, Snap delineates how it may

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] SNAP, ADVERTISER PRIVACY AND SECURITY FAQs, https://businesshelp.snapchat.com/s/article/snap-privacy-faq.

[78] SNAP, SNAP CONVERSION TERMS, https://www.snap.com/terms/snap-conversion.

[79] *Id.*

"share Event Data with … its affiliates, service providers, and agents to improve the Services[.]"[80]  Thus, Snap has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, Snap's own provision, improvement and supplementation of Snap services; ad and targeting optimization; and data sharing.

**VIII. Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties**

91.    Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for LinkedIn, Meta, or Snap to engage in this wiretapping.

92.    Nowhere on the Website does Defendant provide notice of its privacy-related practices that is prominently displayed, designed to attract Website users' attention, and distinctive in appearance.

93.    Nowhere on the Website does Defendant adequately disclose the tracking here at issue, including that:

- The Third Parties, as enabled by Defendant, intercept the contents of Californians' communications on the Website, in real time.

- These communications include, but are not limited to, "guest records," which are affirmatively entered by users on the Website and confidential under Cal. Civil Code § 53.5(c).  Namely, the Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay.  The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.

- This information is not anonymized because Defendant enables the Third Parties to link users' communications with personal information that reveals their identities.  Such personal information includes the values contained in cookies, email

---

[80] *Id.*

addresses, and/or phone numbers, which constitute "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).

94.    Nowhere on the Website does Defendant request or receive Website users' affirmative consent *prior to* enabling the Third Parties' tracking technologies. Analysis of the Website reveals that the Third Parties' tracking technologies are active as soon as the Website loads, before Website users could even conceivably be put on notice or provide affirmative consent.

## CLASS ALLEGATIONS

95.    Plaintiff seeks certification of the following class: all California residents who have accessed and navigated the Website while in California (the "Class").

96.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

97.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

98.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.   Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this

litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

99. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

100. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to the Third Parties.

101. **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

102. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631(a)**

103.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

104.    Plaintiff brings this Count individually and on behalf of the members of the Class.

105.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

106.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

107.   The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

108.   Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties have the capability to use the wiretapped information for their own purposes.  Accordingly, LinkedIn, Meta, and Snap were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

109.   At all relevant times, by their tracking technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning

of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

110. At all relevant times, the Third Parties used or attempted to use the communications intercepted by their tracking technologies for their own purposes.

111. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Third Parties' tracking technologies and to accomplish the wrongful conduct at issue here.

112. Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

113. The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties – as enabled by Defendant – routed Plaintiff's and Class Members' electronic communications to the Third Parties' servers.

114. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632

115. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

116. Plaintiff brings this Count individually and on behalf of the members of the Class.

117. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

118. The Third Parties' tracking technologies are "electronic amplifying or recording device[s]." *Id.*

119. Cal. Civ. Code § 53.5(a) states:

> [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations, or any employee or agent thereof, who offers or accepts payment for rooms, sleeping accommodations, or board and lodging, or other similar accommodation, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

120. Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

121. Here, Website users' communications with Defendant – made while browsing and booking Fairmont hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

122. First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c). As described *supra*, §§ IV, VI, Defendant

enables LinkedIn to identify individual Website users by their respective LinkedIn member accounts, utilizing several cookies, including the _guid; lms_ads; and lms_analytics cookies. Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., email address, phone number, etc.). Defendant enables Snap to identify individual Website users by their respective Snapchat accounts, utilizing several cookies, including the _scid; _scid_r; sc_at; and sc-a-nonce cookies. Defendant also enables Snap to identify individual Website users through PII (personally identifiable information) matching, by which Snap records the contact details Website users provide on the Website (i.e., email address, phone number, etc.). These pieces of data collected by LinkedIn, Meta, and Snap constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals. *Id.*

123. Second, Website users' communications with Fairmont "identif[y] an individual [as a Fairmont] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications. These communications "identif[y] an individual [as a Fairmont] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Fairmont – individuals with

"express or implied invitation to enter or use [Fairmont's] premises."[81]    These communications also identify certain Website users (those who complete the booking process) as Fairmont hotel "guests" and "customers."

124.    Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5.  Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Fairmont] that has no independent right to use or share the data beyond the terms of the contract."  Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant.  Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

125.    When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like LinkedIn, Meta, and Snap would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

126.    Plaintiff and Class Members did not consent to any of the Third Parties' actions.  Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

127.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

---

[81] INVITEE, Black's Law Dictionary (11th ed. 2019).

1

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  March 19, 2025                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By:   */s/ Philip L. Fraietta*
            Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*